Slip Op. 07-95

UNITED STATES COURT OF INTERNATIONAL TRADE

```
                                 :
JINFU TRADING CO., LTD.,         :
                                 :
               Plaintiff,        :
                                 :
      v.                         :
                                 : Before: Richard K. Eaton, Judge
UNITED STATES,                   :
                                 : Court No. 04-00597
               Defendant,        : Public Version
                                 :
      and                        :
                                 :
AMERICAN HONEY PRODUCERS         :
ASSOCIATION and SIOUX HONEY      :
ASSOCIATION,                     :
                                 :
               Deft.-Ints.       :
                                 :
```

OPINION AND ORDER

[Commerce's Final Results of Redetermination Pursuant to Remand are remanded.]

Dated: June 13, 2007

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Bruce M. Mitchell*, *Paul G. Figueroa* and *Adam M. Dambrov*), for plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Patricia M. McCarthy*, Deputy Director, International Trade Section, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand*); Office of the Chief Counsel, Import Administration, United States Department of Commerce (*Douglas S. Ierley*), of counsel, for defendant.

*Collier, Shannon, Scott, PLLC* (*Michael J. Coursey*, *Adam H. Gordon* and *Jennifer E. McCadney*), for defendant-intervenors.

Eaton, Judge:  Before the court are the United States
Department of Commerce's ("Commerce" or the "Department") final
results of its redetermination pursuant to the court's remand
order in *Jinfu Trading, Co., Ltd. v. United States*, 30 CIT __,
Slip Op. 06-137 (Sept. 7, 2006) ("*Jinfu I*").[1]  *See* Final Results
of Redetermination Pursuant to Remand (Dep't of Commerce Dec. 5,
2006) ("Remand Redetermination").  In *Jinfu I*, the court remanded
Commerce's decision to rescind plaintiff Jinfu Trading Co.,
Ltd.'s ("Jinfu PRC") new shipper review upon concluding that
Jinfu PRC was not affiliated with either Yousheng Trading
(U.S.A.) Co., Ltd. ("Yousheng USA") or its successor Jinfu
Trading (U.S.A.) Co., Ltd. ("Jinfu USA") within the meaning of 19
U.S.C. § 1677(33)(F) or (G) (2000).[2]  *See Jinfu I*, 30 CIT at __,
Slip Op. 06-137 at 32; *see also* Honey from the People's Republic
of China ("PRC"), 69 Fed. Reg. 64,029 (Dep't of Commerce Nov. 3,

---

[1]     For purposes of confidentiality, the court will employ
the same shorthand references used in *Jinfu I*.  Specifically,
Jinfu Trading ("U.S.A.") Co., Ltd.'s sole employee is referred to
as "Mr. A"; the chief executive officer of Jinfu Trading Co.,
Ltd. as "CEO B"; the unaffiliated U.S. buyer as "Customer C"; and
the original owner of what was then Yousheng Trading ("U.S.A.")
Co., Ltd. ("Yousheng USA") as "Mr. D."  The attorney retained in
October 2002 to aid in the attempted transfer of ownership of
Yousheng USA to CEO B is referred to as "Attorney E."

[2]     Pursuant to 19 U.S.C. § 1677(33)(F), "[t]wo or more
persons directly or indirectly controlling, controlled by, or
under common control with, any person" are considered affiliated.
Under 19 U.S.C. § 1677(33)(G), Commerce will find affiliated
"[a]ny person who controls any other person and such other
person."

2004) ("Final Results").[3]  As a result of the new shipper review

being rescinded, Commerce assigned the country-wide dumping rate

of 183.80 percent to Jinfu PRC's honey exports to the United

States.  *See* Final Results, 69 Fed. Reg. at 64,030.  On remand,

the court directed Commerce to either reinstate plaintiff's new

shipper review or reopen the record to provide plaintiff with an

opportunity to submit additional evidence concerning the issue of

affiliation.  In particular, plaintiff would be provided with an

opportunity to place on the record evidence that the chief

executive officer of Jinfu PRC, CEO B, controlled the pricing[4]

---

[3]     Whether Jinfu PRC was affiliated with either Yousheng
USA or Jinfu USA is relevant because under 19 C.F.R.
§ 351.214(b)(2)(iv)(C) (2005), a party seeking a new shipper
review must provide documentation establishing "[t]he date of the
first sale to an unaffiliated customer in the United
States . . . ."  Before Commerce, plaintiff submitted
documentation in support of its claim that the new shipper sale
was made by Jinfu PRC (via Jinfu USA) to Customer C on November
2, 2002.  Based on that documentation, Commerce initiated the new
shipper review.  Having found the documentation insufficient to
establish that Jinfu PRC was affiliated with either Yousheng USA
or Jinfu USA as of that date, however, Commerce rescinded the
review.  Commerce took this action because, absent affiliation,
the sale to Customer C could not be considered a sale by Jinfu
PRC.  Thus, it is the absence of documentation supporting
plaintiff's claim that it was affiliated with either Yousheng USA
or Jinfu USA on November 2, 2002, that resulted in Commerce's
cessation of the new shipper review.

[4]     The presence of control may be contingent on the
existence of evidence that one party has the potential to control
the pricing decisions of the other.  *See* 19 C.F.R.
§ 351.102(b); *see also Hontex Enters., Inc. v. United States*, 27
CIT 272, 296, 248 F. Supp. 2d 1323, 1343 (2003) (holding that
control, and thus affiliation, can only be had if "the
relationship [is] such that it has the potential to impact
decisions concerning production, pricing, or cost of subject
                                            (continued...)

Court No. 04-00597                                              Page  4

decisions made by Jinfu USA's sole employee, Mr. A.  *See Jinfu I*,

30 CIT at __, Slip Op. 06-137 at 32-33.

On remand, Commerce reopened the record and plaintiff

submitted additional evidence concerning affiliation.  *See* Remand

Redetermination at 2.  After considering this additional

evidence, plaintiff's accompanying explanation of that evidence

and all other comments from interested parties, Commerce

continued to find that neither Yousheng USA nor its successor

Jinfu USA were affiliated with Jinfu PRC at the time of the

claimed new shipper sale.  *See* Remand Redetermination at 3.

Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2000) and

19 U.S.C. § 1516a(a)(2)(B)(iii).  For the following reasons, the

court remands Commerce's determination for a second time.


BACKGROUND

Familiarity with this case is presumed.  The court sets

forth only those facts relevant to this opinion.  At issue in

*Jinfu I* was plaintiff's contention that Commerce erroneously

concluded that Jinfu USA and Jinfu PRC were not affiliated on the

date of the claimed new shipper sale, November 2, 2002.  The

primary basis for the Department's conclusion was its finding

that Jinfu PRC did not own either Yousheng USA or Jinfu USA as of

_____

    [4](...continued)
merchandise") (internal quotation marks omitted).

that date.  *See* Issues & Decision Mem. for the Final Results and
Final Rescission, In Part, of the New Shipper Review of the
Antidumping Duty Order on Honey from the PRC (Dep't of Commerce
Oct. 25, 2004) ("Issues & Decision Mem.") at 10-11.  In *Jinfu I*,
the court's review of the record and the parties' submissions
revealed that, while nothing indicated that CEO B owned either
Yousheng USA or Jinfu USA on or before November 2, 2002, there
was, in fact, evidence that CEO B not only had the potential to
influence what was then Yousheng USA's pricing decisions, but
actually exercised that control.  *See Jinfu I*, 30 CIT at __, Slip
Op. 06-137 at 28.

In reaching this finding, the court relied heavily on the
contents of the Department's verification report.  That report
indicated that, while Mr. A negotiated the price of the honey
with the U.S. customer, Customer C, the final transaction was
consummated only after CEO B approved the sales price.  *See id.*
at __, Slip Op. 06-137 at 29.  This approval was evidenced by
facsimile transmissions exchanged between Jinfu USA and Jinfu
PRC.  *See id.* at __, Slip Op. 06-137 at 30-31 ("[T]he faxes
indicate that Mr. A did not enter into the transaction at the
quoted price before getting the approval of CEO B, and that he
believed he was working for a single enterprise encompassing

Jinfu PRC and Yousheng USA.").[5]

---

    [5]   The faxes were exchanged on November 13, 2002.  Mr. A initiated the discourse in his fax to CEO B:

> Firstly, I would like to report [to] you that the current market price of honey in the United States is between [[        ]] and [[        ]] per pound.  Because of the sharp reduction of the export of honey from other countries, the domestic sales and price of honey in the United States is very promising.
>
> I contacted a US local client who was willing to order a container of honey at the ex-warehouse price of [[        ]] USD per ton on the condition that it can pass the examination of US customs and FDA.  Since the annual purchasing amount of this client is relatively significant, if a good relationship can be established with this client, it will be of great help to our company's sales to the US.
>
> Please let me know you[r] opinion and advise me further.

Letter from Bruce M. Mitchell to Abdelali Elouaradia, Oct. 23, 2006, Ex. 19 ("Pl.'s Remand Submission").  On the same day CEO B responded, stating:

> We received you[r] letter and felt happy that there are clients . . . interested in the honey product of our company.  You did a good job on the report of US market.  We finished a container . . . on November 5.
>
> In order to open the US market and better understand the marketing information, I agree with you.  We accept the client's quotation of [[        ]] USD per ton as ex-warehouse price on the condition that it passes the examination of the US customs and FDA.  Please make the preparation and keep in touch with the client for purpose of long term cooperation.  I hereby authorize you to sign contract with the client.

(continued...)

Based on the evidence of CEO B's control of the pricing
decisions of the claimed U.S. affiliate and the absence from the
Final Results of a thorough discussion of the matter, the court
remanded the Final Results to the Department and instructed it
"to either find that Jinfu PRC and Yousheng USA were affiliated
as of November 2, 2002, and to reinstate plaintiff's new shipper
review, or to provide other record evidence to support its
conclusion that the companies were not affiliated." *Jinfu I*, 30
CIT at __, Slip Op. 06-137 at 32-33.  If the Department chose not
to find the companies affiliated, the court instructed the
Department to "reopen the record to provide plaintiff with an
opportunity to place thereon further evidence with respect to
affiliation and to provide an explanation of that evidence." *Id.*
at __, Slip Op. 06-137 at 33.

On remand, Commerce chose the court's second option and
reopened the record.  On October 23, 2006, plaintiff submitted
additional evidence regarding the issue of affiliation and
provided an explanation of that evidence.  *See* Remand
Redetermination at 2.  On November 13, 2006, the Department,
having considered plaintiff's additional evidence, issued its
draft remand redetermination in which it again concluded that the

_____

[5](...continued)
        Please process as soon as possible.

Pl.'s Remand Submission, Ex. 20.

companies were not affiliated within the meaning of 19 U.S.C.
§ 1677(33) because CEO B did not control the pricing decisions of
either Yousheng USA or Jinfu USA.  On November 20, 2006,
plaintiff commented on the draft redetermination.  Commerce also
permitted the American Honey Producers Association and the Sioux
Honey Association, as interested parties, to comment on the draft
results, which they did on November 22, 2006.

After considering the additional evidence and the
accompanying comments and explanations, Commerce determined that
it would "not change[] [its] finding of no affiliation between
Jinfu PRC and Yousheng USA/Jinfu USA at the time of the relevant
U.S. sale, i.e., November 2, 2002."  Remand Redetermination at
2-3.  Thus, Commerce reaffirmed its earlier determination and
declined to reinstate plaintiff's new shipper review.


                        STANDARD OF REVIEW
The court reviews Commerce's Remand Redetermination for
substantial evidence.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i) ("The
court shall hold unlawful any determination, finding, or
conclusion found . . . to be unsupported by substantial evidence
on the record, or otherwise not in accordance with law.").
"Substantial evidence is 'such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion.'"  *Huaiyin
Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374

(Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)).  To determine the existence of substantial

evidence, the court must "consider[] the record as a whole,

including evidence that supports as well as evidence that 'fairly

detracts from the substantiality of the evidence.'"  *Id.* (quoting

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir.

1984)).  The possibility of drawing two opposite yet equally

justified conclusions from the record will not prevent the

agency's determination from being supported by substantial

evidence.  *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620

(1966).


DISCUSSION

    The court must now decide whether Commerce has, on remand,

supported with substantial evidence from the record its

conclusion that Jinfu PRC did not control or have the potential

to control the pricing decisions of Yousheng USA or its successor

Jinfu USA as of November 2, 2002.

    In its Remand Redetermination, Commerce found that "the

record d[id] not support a finding that CEO B had control over

Mr. A's business decisions, particularly those dealing with

pricing."  Remand Redetermination at 7.  The Department

maintained this position despite the presence on the record of

the faxes exchanged between Mr. A and CEO B.

Commerce first took issue with the faxes' credibility.

> At verification, Department officials
> questioned the credibility of the exchanged
> facsimiles given that neither document
> contained any fax communications commonly
> found at the top of most faxed transmissions.
> Mr. A stated that he did not have a facsimile
> report recording the date and time he
> transmitted the letter to CEO B.  The lack of
> transmission information on the faxes, when
> viewed in the context of credibility
> problems[6] regarding corporate ownership
> documents submitted by Jinfu PRC to the
> Department, raises questions regarding the
> veracity and reliability of the facsimiles.

Remand Redetermination at 10.  Commerce, therefore, appeared to

take the view that, because it was justified in suspecting the

reliability of plaintiff's proffered evidence of ownership, it

was entitled to view all evidence relating to the claimed new

shipper sale with skepticism.

The Department also concluded that even if the faxes were to

be found credible, they would not support a finding of control

because they were exchanged after the subject honey was shipped.

The Department observes that the subject shipment, "[p]er the

bill of lading, . . . left the port of Shanghai for Oakland [,

---

[6]     A primary reason for Commerce's conclusion in the Final
Results that CEO B did not own Jinfu USA on November 2, 2002, was
its finding that the evidence supporting plaintiff's ownership
claim was incredible.  *See* Issues & Decision Mem. at 26.   In
particular, Commerce found that plaintiff's "corporate
resolutions, a certificate of transfer of stocks, amended
articles of incorporation and by-laws, and a receipt for legal
services preparing these documents," were backdated.  Def.'s
Resp. to Comments Upon Final Results of Redetermination Pursuant
to Remand ("Def's Resp.") 12 n.4.

California] on November 5, 2002," and that the facsimiles were

exchanged on November 13, 2002.  Remand Redetermination at 9.

Commerce explained:

> According to the facsimiles, CEO B agreed to
> the price negotiated by Mr. A on November 13,
> 2002 (the date of the fax from CEO B to Mr.
> A), subsequent to which Mr. A entered into a
> sales contract with the U.S. customer.  The
> price, according to statements at
> verification and as noted above, was reached
> through negotiations between Mr. A and the
> U.S. customer at a time that coincided with
> Jinfu PRC's sale to Mr. A. . . .
>
> Given that the goods were on the water headed
> for Oakland . . . at the time the alleged
> facsimiles were exchanged between Mr. A and
> CEO B, these documents are irrelevant in
> establishing that Mr. A's price negotiations
> were subject to the approval of CEO B.

Remand Redetermination at 10.  Commerce, then, concluded that in

light of "the timeline presented above, the U.S. resale price was

established and agreed upon prior to the date of the alleged

facsimiles, i.e., November 13, 2002."  Remand Redetermination at

11.

Commerce further discounted the faxes' probative value by

stating that, "even if considered credible or reliable, [the

faxes] merely indicate that Mr. A found a customer willing to pay

X price per [metric ton] for the honey and that CEO B agreed to

this price."  Remand Redetermination at 11 (footnote omitted).

The Department apparently concluded that, because the price of

the honey remained unchanged from the original price negotiated

by Mr. A, CEO B's approval could not be considered evidence of

his control over Mr. A's pricing decisions.  *See* Remand

Redetermination at 11 ("The contract with the U.S. customer is

signed on November 15, 2002, on terms that d[id] not change

between then and the shipment to the end-user. . . .  The terms

of this sale also did not change between contract and receipt of

payment.").  In reaching its conclusion, though, Commerce does

not discuss the sentence in CEO B's fax to Mr. A "I hereby

authorize you to sign contract with the client."  Letter from

Bruce M. Mitchell to Abdelali Elouaradia, Oct. 23, 2006, Ex. 20

("Pl.'s Remand Submission").

As further evidence that CEO B did not have the potential to

control Mr. A's pricing decisions, the Department relied on

specific business-related actions taken by Mr. A without first

consulting CEO B.  *See* Remand Redetermination at 12.  In

particular, the Department asserted that, unbeknownst to CEO B,

"the U.S. customer was financing the entire U.S. transaction in

question."  Remand Redetermination at 12.  Commerce stated:

> The total amount paid by the U.S. customer by
> November 20, 2002, . . . was received by Mr.
> A prior to paying the bill from the freight
> forwarding company.  Moreover, in reviewing
> Jinfu USA's checkbook registers at
> verification, Department officials discovered
> that Mr. A had also borrowed money from the
> U.S. customer in order to pay Jinfu USA's
> freight forwarding bill for a later sale.
> There is no evidence on the record to suggest
> that Mr. A requested approval from CEO B
> prior to receiving the loan, nor is there
> evidence on the record to suggest that Jinfu
> PRC sent money to its alleged affiliate to

repay the loan.

Remand Redetermination at 12 (citation omitted).  The Department,
thus, concluded that CEO B could not be in a position to exercise
control over Mr. A and Jinfu USA if Mr. A could receive the
advance payment and obtain the loan without CEO B's approval.

Finally, the Department found the contents of affidavits of
Mr. A, CEO B and Jinfu PRC's account manager submitted to
establish that Mr. A believed he was under CEO B's control to be
"contradicted by record evidence."  Remand Redetermination at 20;
*see* Mr. A Aff. ¶¶ 9, 12 (explaining that at the time of the new
shipper sale, "I was working for and being paid by [CEO B]," and
that "[i]t ha[d] always been my understanding that Jinfu USA was
owned by [CEO B] at the time that Jinfu USA purchased honey from
[CEO B's] company in China, and resold the honey to our customer
in the U.S.").

According to Commerce, the statements made by these
individuals at verification, in particular those of Mr. A, tell a
different story from that presented in the newly submitted
affidavits.  For instance, Commerce observed that at
verification, "Mr. A stated that he did not want CEO B to have
direct access to Jinfu USA's U.S. customers because of the
possibility that Jinfu PRC would sell directly to the customers."
Remand Redetermination at 20 (citation omitted).  As another
example, the Department repeated its assertion that Mr. A
"obtained a loan from the U.S. customer to pay for his freight

forwarding bill without first seeking CEO B's approval."  Remand
Redetermination at 21 (citation omitted).  Based on its
conclusion that the statements in the newly submitted affidavits
concerning Mr. A's belief that he was under the control of CEO B
were not supported by the evidence already on the record, the
Department found that they failed to justify a finding of
affiliation by way of control.

    Thus, after considering the additional evidence plaintiff
placed on the record regarding the question of affiliation and
comparing it with earlier submitted record evidence, the
Department concluded that "[t]here is substantial evidence on the
record that demonstrates . . . that Mr. A made the sale of honey
to the U.S. customer without the approval of CEO B . . . ."
Remand Redetermination at 18.  Commerce, therefore, continued to
find that Jinfu PRC was not affiliated with either Yousheng USA
or its successor Jinfu USA as of the date of the claimed new
shipper sale and that, as a result, plaintiff was not entitled to
a new shipper review.

    Plaintiff makes both factual and procedural objections to
the Department's Remand Redetermination, insisting at all times
that the record supports a finding of affiliation.  *See generally*
Pl.'s Comments Resp. Commerce's Final Results of Redetermination
("Pl.'s Comments").  In contesting Commerce's factual
determinations, plaintiff reasserts its argument in *Jinfu I* that

CEO B actually owned Jinfu USA on November 2, 2002.  That is,
plaintiff maintains that the evidence it claims shows ownership
demonstrates, at a minimum, that CEO B controlled the company as
of the date of the claimed new shipper sale.

In addition to that previously placed on the record,
plaintiff cites two pieces of new evidence it submitted on remand
to support its position.  First, plaintiff points to an affidavit
from Attorney E.  According to Attorney E, he "was retained in
October 2002 to transfer ownership of Jinfu USA to CEO B and that
in October 2002 he drafted and provided to Mr. A and CEO B
documents which, if they had been promptly and properly executed,
actually transferred legal ownership of Yousheng/Jinfu USA to CEO
B."  Pl.'s Comments 12.  Second, plaintiff asserts that
affidavits of CEO B, Mr. D (the previous owner of Yousheng USA)
and Mr. A each reveal that CEO B owned or controlled Jinfu USA as
early as October 2002.  *See* Pl.'s Comments 8-9.  As plaintiff
explains, the affidavits repeat its claims in *Jinfu I* regarding
Mr. D's intention to transfer ownership to CEO B and CEO B's
intention to purchase the company.  Moreover, the affidavits are
pointed to as proof of Mr. A's understanding that he needed CEO
B's approval on all pricing and sales decisions.  Plaintiff,
therefore, contends that while

> the additional documents submitted [on
> remand] on October 23, 2006, are sufficient
> to establish that CEO B actually owned Jinfu
> USA prior to [Jinfu PRC]'s initial sale to

> the United States . . . this Court need not
> reconsider this issue at this time, since
> these documents also reconfirm that
> operational control of Yousheng/Jinfu USA had
> been transferred to CEO B, notwithstanding
> that legal ownership arguably remained with
> Mr. D.

Pl.'s Comments 12 n.4; *see also* Pl.'s Comments 12-13 (insisting

that the new submissions "constitute[] compelling evidence that

CEO B actually had operational control of Yousheng/Jinfu USA at

the end of October 2002").  Thus, plaintiff takes the position

that the evidence, if not demonstrating ownership, at least

establishes that CEO B actually controlled Mr. A's pricing

decisions.

Plaintiff next takes issue with the Department's conclusion

that Mr. A finalized the sales price of the honey with Customer C

without obtaining CEO B's approval.  *See* Pl.'s Comments 14.  For

plaintiff, "[t]his determination is simply wrong."  Pl.'s

Comments 14.  The key pieces of evidence for plaintiff's position

remain the faxes transmitted between Mr. A and CEO B.  Plaintiff

characterizes as baseless the Department's decision not to attach

substantial weight to these transmissions "because of their

failure to have fax communications commonly found at the top of

most transmissions."  Pl.'s Comments 15 (internal quotation marks

& citation omitted).  For plaintiff:

> The facsimile exchange clearly conveys the
> message which the parties intended to convey
> — that Mr. A was seeking CEO B's approval of
> a sales price to a particular customer and

> that CEO B approved this price and agreed to
> the sale.  And as the Department implies,
> while "fax communication" may "normally" have
> notations at the top, the absence of such
> notation does not compel a conclusion (as the
> Department now suggests) that the facsimiles
> were never sent or received.

Pl.'s Comments 15 (footnote omitted).

Plaintiff further challenges the Department's

characterization of the evidence that the honey was shipped

before Mr. A received CEO B's approval of the price.

> The Department suggests that evidence
> supporting its claim is found in the facts
> that: (1) Mr. A negotiated prices with
> Customer C in late October and early November
> 2002; and (2) the merchandise was already on
> the water destined for Oakland prior to
> November 13, 2002.  These facts do not
> constitute evidence that CEO B did not
> exercise operational control over
> Yousheng/Jinfu USA.  In this regard, Mr. A
> and Customer C did not enter into a formal
> agreement for Jinfu USA to sell honey to
> Customer C until November 15, 2002.  Contrary
> to the Department's suggestion, there does
> not exist a scintilla of evidence that this
> resale was consummated, and the material
> terms of sale established with certainty
> prior to this date.  Merchandise is often
> resold by a U.S. importer (e.g., Jinfu USA)
> to an ultimate consumer (e.g., Customer C)
> while in-transit to the United States, and as
> Mr. A advised the Department at verification,
> "he was confident that if . . . {Customer C}
> . . . had not purchased the . . . honey, he
> would be able to find another buyer through
> his relationships with sales representatives/
> importers . . . ."

Pl.'s Comments 15-16 (footnotes & citations omitted).  Put

another way, it is plaintiff's view that the honey's shipment

prior to November 13, 2002, the date CEO B agreed to the purchase

price, bore no relationship to a finding that CEO B controlled the price of the honey sold to Customer C.

Plaintiff also contends that in reaching its conclusion that CEO B was not in a position to exercise control over Jinfu USA, the Department gave undue credit to evidence indicating that: (1) Mr. A received pre-payment from Customer C for the new shipper sale; and (2) that he also obtained a loan from Customer C to finance a later transaction. *See* Pl.'s Comments 16-17.  First, with respect to Mr. A's receipt of the advance payment, plaintiff insists that "the fact that Customer C may have financed the transaction by paying Jinfu USA for the merchandise prior to such time as Jinfu USA paid its freight forwarding company is completely unrelated to whether CEO B exercised operational control over Jinfu USA."  Pl.'s Comments 17.  Second, with regard to Customer C's loan to Mr. A, plaintiff argues that, because "the loan to which the Department refers relates to a transaction which took place in August 2003, . . . [t]he fact that there may be no evidence on this . . . record to suggest that Mr. A requested approval from CEO B prior to receiving the loan . . . is neither surprising nor significant."  Pl.'s Comments 17.  As plaintiff states, "a sales transaction subsequent to the [new shipper review] . . . normally is not subject to analysis in a verification of a [new shipper review]."  Pl.'s Comments 17. That is, because the loan was for a sale that took place after

Commerce initiated the new shipper review, the absence of any

record evidence concerning the loan was to be expected.

Finally, plaintiff claims that the Department made a

procedural error in rendering the Remand Redetermination without

providing plaintiff an opportunity to place on the record

additional evidence intended to address Commerce's concerns

regarding the credibility and reliability of the faxes and the

circumstances surrounding the advance payment and loan by

Customer C to Jinfu USA.  *See* Pl.'s Comments 18.  Plaintiff

claims that it was prejudiced because the Department's primary

reliance on the faxes, the Customer C pre-payment of the sales

price for the claimed shipper transaction and the later loan was

not made known until the issuance of the draft results of the

remand redetermination.  That is, plaintiff claims that while it

was given the opportunity to, and in fact did submit comments on

the draft redetermination, it was not allowed to place on the

record specific evidence rebutting the Department's new

conclusions.  *See* Pl.'s Comments 18 ("[Plaintiff], not

surprisingly, was unable to read the Department's mind and to

provide documentation addressing certain factors which the

Department now considers relevant . . . .").  Thus, plaintiff

asks that "in the event that this Court decides that the

Department's Redetermination should not be reversed," it be

allowed to supplement the record with additional evidence "which

directly addresses the Department's rationale."  Pl.'s Comments 20.

As the court noted in *Jinfu I*, "[i]n its affiliation analysis, Commerce must examine the subject relationship in accordance with 19 U.S.C. § 1677(33)."  *Jinfu I*, 30 CIT at __, Slip Op. 06-137 at 12–13 (footnote omitted).  The court further stated that, in this case, under 19 U.S.C. § 1677(33), a finding of control, and thus affiliation requires "proof that one person . . . 'ha[s] the potential to impact the decisions concerning the . . . pricing . . . of the subject merchandise.'" *Jinfu I*, 30 CIT at __, Slip Op, 06-136 at 27 (quoting *TIJID, Inc. v. United States*, 29 CIT __, __, 366 F. Supp. 2d 1286, 1293 (2005)); *see also* 19 C.F.R. § 351.102(b) ("The Secretary will not find that control exists . . . unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise . . . .").  Thus, as was its charge in *Jinfu I*, the court now "must determine whether Commerce reasonably concluded that the evidence [on remand] failed to demonstrate that on November 2, 2002, CEO B had, at a minimum, the potential to exercise control over the pricing decisions of Yousheng USA."  *Jinfu I*, 30 CIT at __, Slip Op. 06-137 at 16.

The Court of Appeals for the Federal Circuit has made it clear that, when reviewing an agency determination for substantial evidence, this Court "do[es] not make the

determination; [it] merely vet[s] the determination." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).  In other words, the Court "must affirm a [Commerce] determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the [Department]'s conclusion." *Id.* (internal quotation marks & citation omitted).

In its Remand Redetermination, Commerce has again found that the evidence, including that newly submitted on remand by plaintiff, fails to demonstrate that CEO B had the potential to control or actually controlled Jinfu USA as of November 2, 2002. On remand, the Department took into consideration affidavits of CEO B, Mr. A, Mr. D and Attorney E.  In addition, the Department emphasized the faxed communications between Mr. A and CEO B regarding the price Mr. A was to charge Customer C for the honey. In large part because it found this evidence to be incredible, the Department continued to find that CEO B did not control Jinfu USA's pricing decisions.  Commerce, however, failed to explain adequately why the evidence on the record as supplemented on remand supports its finding that CEO B was not in control of Jinfu USA at the time of the claimed new shipper sale.

In particular, Commerce has not explained why its finding that the faxes, "even if considered credible or reliable, merely indicate that Mr. A found a customer willing to pay X price per [metric ton] for the honey and that CEO B agreed to this price."

Remand Redetermination at 11 (footnote omitted).  That is,
Commerce has not articulated a rational connection between its
conclusion that CEO B did not control Jinfu USA's pricing
decisions and its statement that the faxes, if valid, would not
evidence control.  Of particular concern is Commerce's failure to
expressly state why CEO B's approval of the sales price and
authorization to execute the contract do not evidence control.
*See* Pl.'s Remand Submission, Ex. 20 ("We accept the client's
quotation . . . as ex-warehouse price on the condition that it
passes the examination of the US customs and FDA. . . .  I hereby
authorize you to sign contract with the client.").  Indeed, it is
difficult to read the facsimiles without concluding that, if they
are authentic, they are evidence that Mr. A sought CEO B's
approval of the transaction and the price, and that he received
it.  Therefore, the court remands this matter to Commerce to
permit the agency to explain why, if proven to be genuine, the
contents of that exchange would not demonstrate that CEO B
controlled Jinfu USA.

     In addition, the court also finds it proper to allow
plaintiff, on remand, to put on the record specific evidence
aimed at rebutting Commerce's conclusions, which were first made
known in the draft remand redetermination, regarding: (1) the
credibility and reliability of the faxes; and (2) the
circumstances surrounding Customer C's pre-payment of the sales
price and the loan.  This situation is not unlike those presented

in *AK Steel Corporation v. United States*, 22 CIT 1070, 34 F.

Supp. 2d 756 (1998) and *Böwe-Passat v. United States*, 17 CIT 335

(1993) (not reported in the Federal Supplement).  Here, as in

those cases, plaintiff was first made aware of the prominent role

played by certain evidence in Commerce's decision after the

record was closed.  *See AK Steel Corp.*, 22 CIT at 1092, 34 F.

Supp. 2d at 773 (sustaining Commerce's use of respondent's

explanation of data discrepancy as record evidence because

respondent "first became aware that reconciliation was in dispute

upon receiving a copy of [d]omestic [p]roducers' [c]ase

[b]rief"); *Böwe-Passat*, 17 CIT at 343 (remanding matter, and

holding that Commerce's refusal to permit respondent to address

previously unknown deficiencies in its submissions, made known

after record was closed, was a "predatory 'gotcha' policy").

Plaintiff rightly complains that it had no way of knowing that

the lack of a reference date would be pivotal to its case.  Also,

nothing in any of the proceedings had before the draft remand

redetermination indicated that the Department would rely so

heavily on Customer C's having made early and full payment for

the claimed new shipper sale and having loaned Mr. A money to

finance a later transaction without the latter having secured CEO

B's approval.  Therefore, on remand, Commerce is instructed to

reopen the record and permit plaintiff to submit new evidence

with respect to these matters.

Court No. 04-00597                                              Page   24

CONCLUSION

Based on the foregoing, the court finds to be unsupported by substantial evidence Commerce's Remand Redetermination and remands this case for a second time.  On remand, Commerce is to: (1) take into account the court's opinion and provide an explanation as to why the contents of the faxes exchanged between Mr. A and CEO B, if credible and reliable, do not support a conclusion that CEO B controlled Jinfu USA; and (2) reopen the record to allow plaintiff to put on the record new evidence regarding the credibility and reliability of the faxes, the circumstances surrounding Customer C's pre-payment of the sales price for the claimed new shipper sale and the facts behind Mr. A's obtaining a loan from Customer C for a later transaction without first obtaining CEO B's approval.  Remand results are due September 11, 2007.  Comments to the remand results are due October 11, 2007.  Replies to such comments are due October 22, 2007.

                                        /s/Richard K. Eaton
                                          Richard K. Eaton

Dated:     June 13, 2007
           New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                    Deputy Clerk